UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ROLAND BENNETT, | ) |
| | ) |
| Petitioner, | ) |
| v. | ) No. 1:06-cv-254 |
| | ) *Mattice/Carter* |
| DAVID MILLS, Warden | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM

This is a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 by Roland Bennett ("Petitioner") (Court File No. 1). Presently before the Court is Respondent's motion to dismiss (Court File No. 4), upon which the Court previously reserved ruling pending the Respondent's reply to Petitioner's claim that the statute of limitations should be equitably tolled based on his actual innocence (Court File No. 9). The Court has already concluded that, absent equitable tolling on his claim of actual innocence, Petitioner's § 2254 petition is time-barred. (Court File No. 9).

Respondent opposes Petitioner's equitable tolling claim, arguing that the state court's conclusion that the testimony of the recanting robbery victim was inconsistent and unreliable was not an unreasonable determination and that this Court should therefore defer to the state court's credibility conclusion as to the testimony of the recanting robbery victim (Court File No. 14).

As explained below, the Court concludes that Petitioner has not demonstrated that the state court findings were not supported by the record. Accordingly, Petitioner has not demonstrated a credible claim of actual innocence entitling him to equitable tolling of the statute of limitations.

1

## I. BACKGROUND

Petitioner is serving a life sentence for armed robbery and two consecutive 30-year sentences for two aggravated rape convictions. Before turning to the facts of the case and the *coram nobis* testimony, the Court will summarize the procedural history of Petitioner's case.

Petitioner is claiming he is actually innocent of the robbery conviction. Petitioner challenged the sufficiency of the evidence on direct appeal but waited until October 29, 1999-almost twelve years after his robbery conviction became final on March 3, 1986–before filing a state post-conviction petition claiming actual innocence. The state post-conviction petition was dismissed on September 5, 2000, upon request of Petitioner's counsel to withdraw the petition on the grounds that "there has been discovered no newly scientific[ ] evidence that would act as a savings clause under the statute and prevent the statute of limitations from tolling." (Addendum No. 1, at 8). Petitioner subsequently obtained new attorneys, who filed a petition for a writ of error *coram nobis* on June 29, 2001 (Addendum No. 1, at 26-27). After being denied any relief in state court on his *coram nobis* petition, Petitioner filed a habeas petition in this Court on November 7, 2006.

### A. Trial Evidence

The underlying facts which form the basis for Petitioner's conviction are set forth in the state appellate court decision affirming the convictions on direct review:

> At trial, the jury accredited the testimony from the state's witnesses, which indicated that the victim had been sexually assaulted and robbed by the defendant during the early morning hours of July 15, 1984. The accredited testimony included that of David Allen Neal, a television station employee who lived in North Chattanooga. Neal stated that he was driving home from work shortly after midnight on July 15, 1984, when he saw a white female pedestrian grabbed from behind by a black male. Neal drove to an area where he could turn his car around, but by the time he returned to the location where he had seen the other two individuals, they were no longer there.

The victim testified that she was walking home when she was accosted and grabbed by a black male whom she identified as the defendant. She stated that the defendant, whom she had never seen before, was carrying a glass liquor bottle when she first noticed him. He dropped and broke the bottle, however, when the victim stabbed him in the side with an ink pen that she was carrying. The defendant picked up a part of the broken bottle, held it to the victim's neck, and ordered, "Just do what I tell you to do and I won't kill you."

He then dragged the victim through a rock-and-gravel covered lot and up a steep hill to a wooded area. He repeatedly forced the now battered and bleeding woman to the ground and threatened her by placing the broken piece of glass against her throat. After forcing her to perform fellatio and submit to vaginal intercourse, the defendant put on the victim's slacks and left the scene.

A later police search of the area resulted in the recovery of the victim's purse, her pen, and her bloody clothes. The police also recovered a pair of cut-off blue jeans in which they found a set of keys and a gold chain that the victim had been wearing when the assault began.

The discovery of the keys led the police to a nearby residence where they found the defendant hiding in an upstairs closet. At that time, the defendant was still wearing the victim's slacks and a puncture wound was visible on his left side.

Despite the overwhelming evidence against him, the defendant maintained that he was innocent. He testified that the acts of intercourse were performed with the victim's consent and that the gold chain found in his blue jeans actually belonged to him.

*State v. Bennett*, 1985 WL 3644 (Tenn.Crim.App. 1985), *perm. to appeal denied*, (1986).

Petitioner, in effect, first raised his present claim of actual innocence in a state *coram nobis* proceeding when he claimed he was entitled to a new trial based on the victim's recantation of her trial testimony regarding the robbery conviction. In his *coram nobis* petition, Petitioner moved for a new trial in his armed robbery case "on the grounds of newly discovered evidence that would lead to [his] actual innocence. . . ." (Addendum No. 1, p. 26).

3

## B. Error *Coram Nobis* Testimony

The victim in this case testified at the Petitioner's error coram nobis hearing that, after the rape, she was told by the detective they caught the rapist based on her description and the fact that he was wearing her pants. The victim never saw Petitioner after the rape until the trial. Although the victim testified she was having a hard time recalling the exact details, she believed the detective handling the case brought her to the District Attorney's office and introduced her to Assistant District Attorney Steve Bevil ("ADA Bevil"), the prosecuting attorney. She testified that ADA Bevil asked her whether she could pick Petitioner out of a line-up, to which she responded she did not know. According to the victim, ADA Bevil told her it was necessary for her to identify her assailant- even though she told him she never saw the face of the rapist. The victim testified ADA Bevil told her she needed to identify Petitioner and that he said, "This is the Roland Bennett file and it has pictures in it, and you need to be able to identify him." (Addendum No. 2, at 14). She stated that ADA Bevil then left the room and she reviewed the file and pictures.

Although the victim initially testified that she could not precisely remember her discussion with ADA Bevil about the necklace, she later testified that ADA Bevil told her that a conviction on the rape charges would not ensure that he would remain in jail for a substantial amount of time. ADA Bevil explained that she was the fifth white female Petitioner had raped; all the other women were too afraid to testify against him; and a rape conviction would only take him off the streets for two to five years, thus giving him the opportunity to come back out on the streets and rape someone else or even try to harm her or her family (Addendum No. 2, at 14-15). She could not remember being advised of the possible sentence if he was convicted of robbing her necklace, but she testified ADA Bevil said he would be put away for a long time.

4

The victim testified she was scared at the time because she was terrified Petitioner would only spend a couple of years in jail and upon his release try to kill her or come after her daughter, since she was the one who put him in jail. Because she wanted him locked away for a long time, she testified at trial that the chain was hers when, in fact, it was not (Addendum No. 2, at 17). The victim testified during Petitioner's *coram nobis* hearing that the chain in the Petitioner's pocket, which she believed was serpentine, was not her chain, though she did not remember ever telling ADA Bevil it was not her chain (Addendum No. 2, at 18). In addition, she could not remember whether she filed a police report that a gold chain was taken during the rape.

The victim testified that, in 1999, right after her mother passed away, she was first contacted by Debbie Rollins, an investigator who was working on Petitioner's behalf. According to the victim, the first two times she was contacted, she did not tell the investigator anything. About two years later, however, during 2001, she contacted an attorney and "told him the whole story" (Addendum No. 2, at 20-21). The victim testified she remembered the gold chain was not hers and Petitioner was in prison because of her untruthful testimony only after the investigator told her they were trying to get a new trial for Petitioner. The victim testified she had not remembered she lied until after the investigator spoke with her. In response to a question from the judge, the victim admitted she lied on the stand during trial, but testified she forgot she lied during trial until she spoke with Petitioner's investigator.

The victim testified, consistent with her trial testimony, that she knew she had a chain on the night of the rape but she did not remember Petitioner taking it off her neck. She admitted that the chain introduced at trial was found in the Petitioner's pocket and that she told the police officer it was her chain (Addendum No. 2, at 27). On cross-examination the victim testified she could not

5

remember the precise conversation she had with ADA Bevil and could not remember whether she told him the chain was not hers (Addendum No. 2, at 45). The victim also testified that no one advised her she could be charged with perjury if she changed her testimony (Addendum No. 2, at 46). Although the victim admitted she contacted the District Attorney's office trying to find out what was going on after being contacted by Petitioner's investigator, she denied she said anybody was trying to get her to change her story (Addendum No. 2, at 47-48). The victim testified she began developing a relationship with God six years prior to testifying at the *coram nobis* hearing and that was one of the reasons she realized she "needed to get this thing right." (Addendum No. 2, at 49-50).

When asked to describe the gold chain she had at the time of the crime, she testified:

> I believe that I can, because I always wore the same kind of chain. It was say – I'm not really sure what they call it but it – a rope chain, I believe is what they call it, probably similar to the one that I have on now, but I believe it was a little bit larger. I've always wore the same kind of chain.

(Addendum No. 2, at 50). Although the victim testified she thought, but was not sure, that the chain they found was serpentine, she was adamant that the testimony she gave at trial about the chain belonging to her was untrue.

ADA Bevil testified that he had never told any witness what to say in court and this was the first time anyone had ever made such an accusation against him. ADA Bevil further testified that, although Petitioner said he knew and dated the victim and had paid her, he (Bevil) believed the victim, and the proof supported the victim's version–that she was an innocent victim of a very serious crime in which she sustained injuries. The only thing ADA Bevil recalled about the necklace was that the victim said it belonged to her. In addition, his notes from the trial file indicated Detective Ed Foster showed the chain to the victim, who identified it. The prosecutor also testified that his

notes reflected Petitioner said the necklace was his, it had broken a couple of times, he had fixed it, and he found the necklace on the ground during this criminal episode (Addendum No. 3, at 6).

ADA Bevil testified the victim was timid and shy and the prosecutor admitted:

> I may have tried to encourage her that it would be okay to testify, and, and I may have even said that, you know, he needs to be prosecuted because this is a serious offense and if, if she doesn't testify, he may do this to somebody else.
>
> I would, I would have done something like that, but I don't, I don't think that's – you know, I don't think that would have been unethical, because he did have a record of violence and this was what I thought was a violent crime. And I may have told her that, you know, that she should testify, that he needed to be prosecuted so that this would not happen to somebody else, but I did not –I would not have told her to lie.

(Addendum No. 3, at 17).

Although ADA Bevil testified he may have talked to her about identifying Petitioner, he also testified he would not have told her she had to identify him because there was other proof connecting Petitioner to the crime; thus, it was not important for her to identify him. ADA Bevil denied leaving the file with a picture of Petitioner in it for the victim to look at while he was out of the room.

### C. State Court Decisions

Subsequent to the *coram nobis* hearing, the state court issued an order denying the petition for writ of error *coram nobis*. The state court determined that it could not conclude that the victim's recanted testimony was false and her new testimony was true based upon "contradictions in her testimony and reasonable questions about her credibility." (Addendum No. 1, at 64). The court noted the evidence did not support the victim's assertion that the prosecutor encouraged her to lie when identifying the petitioner as her rapist because her identification of the Petitioner was unnecessary to secure a conviction. The court also found that the evidence did not support the victim's assertion

that the prosecutor encouraged her to falsely identify the gold necklace as hers because the victim told police that the necklace was hers before the prosecutor became involved in the case.

The state appellate court subsequently affirmed the lower court's decision denying the error *coram nobis* petition on the grounds that there was sufficient evidence in the record to support the lower court's determination that the victim's testimony at the evidentiary hearing was inconsistent and incredible, thereby supporting the court's inability to find that the victim's recanted testimony was false and her new testimony was true. Observing that the assessment of witness credibility is entrusted to the sound discretion of the trial court, the state appellate court noted the victim's inconsistent statements at the *coram nobis* hearing.

The appellate court also observed that the victim testified she recanted her testimony to exonerate the Petitioner of a crime he did not commit and because she wanted to alleviate her guilty conscience. She also testified, however, that she did not come forward with the information earlier because she had forgotten that she lied until she was interviewed by Petitioner's investigator. Although the victim maintained that the only reason she testified the chain was hers was because the prosecutor encouraged her to do so, she also admitted she identified the chain was hers when questioned by police during their investigation (Addendum No. 2, at 27). Yet she insisted she lied on the witness stand and that the chain, in fact, was not hers. The appellate court affirmed the state *coram nobis* court's decision denying relief.

## II. STANDARD OF REVIEW

The United States Supreme Court has held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). In *Schlup*, the Supreme Court held that a credible

showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition. It is important to note that *Schlup's* claim of innocence was "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315.

In *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005), the United States Court of Appeals for the Sixth Circuit recognized an actual innocence ground for equitably tolling AEDPA's statute of limitation, with the same parameters as the *Schlup* rule. Following *Schlup*, *Souter* requires the petitioner to prove that new reliable evidence establishes his innocence by a more-likely-than-not standard. *Id.* at 596.

In an actual innocence case, the threshold inquiry is whether Petitioner has submitted new reliable facts raising sufficient doubt about his guilt to undermine confidence in his conviction. *Schlup*, 513 U.S. at 317. The burden is on Petitioner to show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* at 327. The Supreme Court has instructed that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324. The actual innocence exception is rare and only applied in extraordinary cases. *Id.* at 321.

Although "[a] false-testimony claim is cognizable on federal habeas review because the 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice'" *Abus-Samad v. Bell*, 420 F.3d 614, 625 (6th Cir.

9

2005) (*quoting Giglio v. United States*, 405 U.S. 150, 153 (1972)), the recanting of trial testimony by prosecution witnesses is typically viewed with the "utmost suspicion." *Bower v. Curtis*, No. 03-1821, 2004 WL 2921973, *6 (6th Cir. 2004) *citing Hence v. Smith*, 37 F. Supp. 2d 970, 981 (E.D. Mich. 1999) (*quoting United States v. Kearney*, 682 F.2d 214, 219 (D.C. Cir. 1982)).

In determining whether the statute of limitations should be tolled to permit consideration of Petitioner's habeas corpus petition, this Court presumes the credibility determinations of the state court in Petitioner's *coram nobis* proceeding are correct. *See Rice v. Collins*, 546 U.S. 333, 342 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial's court's credibility determination."); *Schlup v. Delo*, 513 U.S. 298, 330 (2003) (Although a court may have to assess credibility of witnesses under the *Schlup* gateway standard, "the assessment of the credibility of witnesses is generally beyond the scope of review"); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) ("trial court's resolution of [credibility] questions is entitled ... to 'special deference.'"); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254 gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.") (pre-AEDPA case).

This Court must defer to the state court's credibility determinations of witnesses whose demeanor has been observed by that court, unless Petitioner demonstrates the state credibility determinations are not supported by the record. *See Rice v. Collins*, 546 U.S. 333, 339 (2006) ("Reasonable mind reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determinations"). Accordingly, in determining whether Petitioner has submitted credible new evidence of actual

innocence sufficient for the limited purpose of equitably tolling the statute of limitations, the Court defers to the state *coram nobis* court's credibility determinations.

## III. ANALYSIS

Petitioner argues he is entitled to equitable tolling of the statute of limitations because the newly discovered evidence of the victim's recantation of her trial testimony establishes a credible claim that he is actually innocent of the robbery conviction. The new evidence Petitioner relies upon is the victim's recanting testimony.

When determining whether Petitioner has presented a credible claim of actual innocence, the Court is required, under the facts of this case, to review the state *coram nobis* proceedings. During Petitioner's *coram nobis* proceeding the state court concluded, after observing the victim and listening to her recanting testimony, that the testimony was unreliable, a finding which is presumed correct in this habeas proceeding unless Petitioner demonstrates the finding is not supported by the record.

After reviewing the record, and in evaluating the state court's credibility determinations, the Court finds, contrary to what Petitioner must show here, that the state court's credibility findings, based on the state judge's first-hand observation of the witness' demeanor and other evidence before the state *coram nobis* court, is supported by the record.

Moreover, and in addition to the state court's reasons for finding the recantation not to be credible, the Court finds that there is other evidence in the record to support that conclusion. For example, the victim waited over 12 years before revealing that she presented untruthful testimony during Petitioner's trial. The victim testified she developed a relationship with God about six years prior to testifying in the state *coram nobis* proceeding and this, in part, led to her recantation of her

11

trial testimony. She did not, however, come forward on her own initiative and contact authorities in the judiciary or criminal justice system and inform them that she had testified untruthfully at trial. In addition, she did not admit the lie on the first two occasions she was contacted by Petitioner's investigator.

Rather, the victim remembered she had presented false trial testimony only after she realized that Petitioner knew where she lived, how to contact her, and continued to have her contacted even after she refused to reveal any information to Petitioner's investigator. (Addendum No. 2, at 20). The recanting victim is a woman who testified at trial that she was terrified the Petitioner would only spend a couple of years in jail and upon release would try to kill her since she was the one who had put him in jail. Having reviewed the entire record, the Court finds, as did the state courts below, that the victim's recovered memory and recanted testimony are highly suspect. The recantation is not a persuasive demonstration of actual innocence.

Consequently, Petitioner has failed to present new reliable evidence to support his claim of actual innocence. Accordingly, the victim's unreliable recantation does not support an actual innocence exception to the one-year statute of limitations and Petitioner's habeas petitioner is time-barred.

## III. CONCLUSION

A review of the trial transcript, the *coram nobis* proceeding, and the entire record before this Court leads to the conclusion that the Petitioner has failed to demonstrate that the state court credibility finding was not supported by the record. Accordingly, the victim's recantation is not new reliable evidence. Petitioner's actual innocence claim is thus insufficient to toll the statute of

limitations. Petitioner's habeas petition is time-barred, and he is not entitled to § 2254 relief. His petition will be **DISMISSED.**

An appropriate judgment will enter.

/s/ H.S. Mattice, Jr.
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE